**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **THE DOUGLAS COMPANY,** | Case No. 3:18 CV 59 |
| Plaintiff, | |
| v. | Magistrate Judge James R. Knepp II |
| **SHI-II WARWICK, LLC,** | |
| Defendant / Third-Party Plaintiff, | |
| v. | |
| **MUTUAL PROPERTIES TOLLGATE 275, LLC,** | |
| Third-Party Defendant. | MEMORANDUM OPINION AND ORDER |

## INTRODUCTION

As Kenny Rogers famously sang: "You got to know when to hold 'em, know when to fold 'em, Know when to walk away and know when to run.'' KENNY ROGERS, *The Gambler*, on THE GAMBLER (United Artists 1978). "His advice applies also to litigation—you 'got to know when to hold 'em' by pressing on with a lawsuit, 'know when to fold 'em' by taking the best settlement you think you can get, and know 'when to walk away' by dropping an unpromising case." *In re Lehman Bros. Sec. & ERISA Litig.*, 2012 WL 1563879, at *1 (S.D.N.Y.). The parties to this case objectively indicated that they "kn[e]w when to fold 'em" shortly after a May 2019 mediation. As set forth below, the settlement reached is an enforceable one despite later-expressed subjective beliefs about what cards were on the metaphorical poker table at the time the parties all agreed to fold.

This case arises out of a contract dispute over a construction project in Rhode Island. After a May 2019 private mediation (and correspondence between counsel that followed), Plaintiff The Douglas Company ("Douglas") filed the currently-pending Motion to Enforce Settlement Agreement, and for Attorney's Fees and Prejudgment Interest. (Doc. 37). Third-Party Defendant Mutual Properties Tollgate 275, LLC ("Mutual") opposed (Doc. 39) and Douglas replied (Doc. 41). Defendant/Third-Party Plaintiff SHI-II Warwick, LLC ("SHI") filed a pre-hearing memorandum (Doc. 47) in advance of the evidentiary hearing held before the undersigned on January 31, 2020.[1] For the reasons discussed below, the undersigned GRANTS Douglas's Motion to Enforce Settlement Agreement, but DENIES its request for attorney's fees and prejudgment interest. Further, the undersigned DENIES as MOOT Mutual's pending Motion to Dismiss, Transfer, or Stay. (Doc. 38).

**BACKGROUND**

<u>Underlying Dispute</u>

A brief explanation of the relationship between the three parties is necessary before reaching the issues presented by the currently-pending motion.

In August 2014, Mutual and SHI entered into a Sales Agreement and Deposit Receipt. (SHI Ex. 1). Pursuant to that agreement, Mutual, which owned three parcels of land at 55 Tollgate Hill Road in Warwick, Rhode Island, sold Lot 3 to SHI and retained ownership of Lots 1 and 2. The Agreement provided for "joint development and equal cost sharing by [SHI] and [Mutual] for the development and construction" of an access road to serve all three lots. *Id.*

_____

1. Mutual submitted exhibits in advance of the hearing. *See* Doc. 48. SHI submitted exhibits at the hearing. *See* Tr. 85. Both were admitted pursuant to stipulation. *See* Tr. 124-25. Many of these exhibits are duplicates of one another.

In November 2015, Mutual and SHI entered into an Amended and Restated Sales Agreement. (SHI Ex. 2). Therein, SHI agreed to construct the access road and be responsible for the first $881,992.00 of work (the budgeted amount for the access road), and that any amount in excess would be split evenly between SHI and Mutual. *Id.* at 30. The Amended Sales Agreement reduced the purchase price of Lot 3 by $440,996, equal to Mutual's fifty percent share of the budgeted amount to construct the road. *Id.* at 31. Pursuant to the agreement, at closing, SHI deposited this amount in escrow pursuant to an Escrow Agreement. (SHI Ex. 3); (Mutual Ex. L, Doc. 48-12). The Escrow Agreement provided that Mutual and SHI would distribute funds from the escrow to pay Mutual's share of the cost of construction. SHI and Mutual also entered into an Easement Agreement. (SHI Ex. 4); (Mutual Ex. K, Doc. 48-11). Contained therein was a provision for a signage easement in favor of SHI for a monument sign on Mutual's Lot 2. (Mutual Ex. K, Doc. 48-11, at 2-4).

At the same time, SHI entered into a contract with Douglas to serve as the general contractor for the project. (SHI Ex. 5); (Mutual Ex. J, Doc. 48-10). That contract included, *inter alia*, a $15,000 allowance for a monument sign to identify the businesses located on the road. (Mutual Ex. J, Doc. 48-10, at 70).

During the course of construction, SHI submitted invoices to the escrow agent that it believed were properly due. Mutual disagreed and refused to authorize certain disbursements from the escrow account. At the time of the May 2019 mediation, approximately $130,000 remained in the escrow account. *See* Tr. 43, 94.

The City of Warwick required SHI to post a surety bond in advance of construction. As of December 2017, and at the time of the hearing, the amount remaining was $17,560.00. (SHI Ex. 10) ("The City's Engineering Division has requested that the Planning Board retain $7,650.00 for

the installation of the granite bounds; the Landscape Division has requested that the Planning Board retain $10,000 for final landscape contingencies.").

Douglas filed suit against SHI in the instant case, arguing breach of contract. *See* Doc. 1. It contended SHI failed to pay Douglas the amounts due under its construction contract, specifically $138,704.20. *Id.* at 3. SHI filed an Answer and Third-Party Complaint against Mutual. *See* Doc. 13. Therein, SHI asserted: 1) it had paid one of Douglas's subcontractors directly, reducing the amount owed to Douglas to $91,111.36; and 2) any amounts owed to Douglas were the result of Mutual's failure to pay (by failing to authorize escrow disbursements), not SHI's. *Id.* Mutual responded with a Motion to Dismiss for Lack of Personal Jurisdiction, Motion to Transfer Venue, or Motion to Stay Pending Mediation and Arbitration. (Doc. 23).

Thereafter, the undersigned held a case management conference, and ordered the parties to conduct a mediation in Rhode Island. (Doc. 28, at 1).

<u>Mediation</u>

After some delay, in May 2019, all three parties participated in a private mediation in Rhode Island. *See* Doc. 35 (joint status report). Following the mediation, on May 23, 2019, the mediator sent an email to Michael Crane, counsel for Mutual, stating that Crane "asked [the mediator] to summarize the current demand by Douglas and SHI". (SHI Ex. 11); (Mutual Ex. A, Doc. 48-1). The mediator summarized the demand as:

1. Payment out of the escrow of the following amounts (and then closure of the escrow)

   a. $32,000 to SHI

   b. $65,000 to Douglas

   c. $33,773 to Mutual

2. Mutual takes responsibility for cost and management of any work Mutual decides to do.

3. SHI and Mutual must commit to reasonable cooperation on the signage work.

4. Mutual/reciprocal releases for any actions/issues up to the date of the release.

(SHI Ex. 11); (Mutual Ex. A, Doc. 48-1).

On May 29, 2019, the parties filed a joint status report stating that the mediation was "in process". (Doc. 35, at 1). It further stated: "The parties are currently in settlement discussions and, while a settlement has not been agreed upon, the parties have not reached an impasse either." *Id.*

On May 30, 2019, Crane responded to the mediator stating that the terms set forth were "agreeable to Mutual subject to the language in the mutual release." (SHI Ex. 11); (Mutual Ex. B, Doc. 48-2).[2]

That same day, the mediator forwarded the email to Crane, Robert Koenig (counsel for SHI-II), and Mark Trimble (counsel for Douglas), stating: "We have an agreement as set forth below, with a couple of odds and ends: form of release and the water service materials mentioned by Mike, below. Who will take the laboring oar to draft an agreement?" (SHI Ex. 11); (Mutual Ex. B, Doc. 48-2). Koenig (counsel for SHI-II), drafted an agreement and emailed it to the mediator,

---

2. It further stated:

> There was a statement made that the materials for the installation of the water service were purchased. Are those still available for Mutual's use?

> Either way, please let me know who will be taking the first stab at drafting the release or is that for the parties to decide?

(Doc. 37-1, at 2). That Douglas agreed to provide the water service materials to Mutual is not disputed. *See* Tr. 76-77.

Crane (counsel for Mutual), and Trimble (counsel for Douglas) on June 4, 2019. (Mutual Ex. C, Doc. 48-3). The proposed draft agreement contained the following provision:

> 2. Mutual is responsible to pay the entire cost of completing any and all incomplete work remaining under the Construction Contract (including but not limited to all engineering, labor, material costs, as well as any inspection and testing fees) including but not limited to installation of a sign that is mutually acceptable with SHI-II. This work must be completed within 90 days of the date that this Agreement is fully executed to the satisfaction of the City of Warwick, Rhode Island so that the SHI-II surety bond can be released.

*Id.* at 5-6. The following day, Crane replied to all, stating that Mutual did not agree to this provision. (Mutual Ex. D., Doc. 48-4, at 2) ("It is my understanding that Mutual did not agree to #2[.]"). Koenig responded, stating SHI "only agreed that Mutual should receive any money out of the Escrow Account because it believed that Mutual would use those funds to install an appropriate sign and finish whatever work was needed to satisfy the City of Warwick so that its surety bond can be released." *Id.* at 1. Crane replied that "Mutual never agreed to finishing the job. Just to working together to help with the completion of the sign." *Id.*

On June 11, 2019, Trimble responded to a request from the American Arbitration Association (through which the parties had hired the mediator) as to the status of the mediation. (Mutual Ex. E., Doc. 48-5). He stated that the parties had reached "a tentative settlement" and "[r]elease language [was] being exchanged between the parties and being negotiated." *Id.*

On June 13, 2019, the parties filed a joint status report (filed by Mutual's co-counsel, Michael Galasso), stating: "The parties have reached a tentative agreement and are negotiating the terms of a written settlement agreement." (Doc. 36).

On July 11 and 17, 2019, Koenig, counsel for SHI, and Michael Crane, counsel for Mutual, exchanged emails. (Mutual Ex. H, Doc. 48-8)

On July 22, 2019, Koenig, counsel for SHI, sent a letter to the mediator stating, "it is now clear that the mediation process has not accomplished a settlement of any of the claims between the parties." (Mutual Ex. I, Doc. 48-9).

On August 20, 2019, Douglas filed the currently-pending Motion to Enforce. (Doc. 37). In response, Mutual filed a second Motion to Dismiss for Lack of Jurisdiction, Motion to Transfer Venue, and Motion to Stay Pending Arbitration. (Doc. 38). Following briefing, in an attempt to informally resolve the issues, the undersigned held two phone conferences (*see* non-document minute entries September 9, 2019 and December 6, 2019), and the parties filed further status reports (*see* Docs. 42, 43, 44, 45, 46). After determining an informal resolution could not be reached, the Court scheduled an evidentiary hearing on the pending Motion to Enforce Settlement Agreement.

Evidentiary Hearing

At the January 31, 2020 evidentiary hearing, the Court heard testimony from both attorneys and representatives of the parties who were present at the May 2019 mediation. The undersigned summarizes the testimony from the party representatives below.[3]

*Testimony of Stephen Soscia (Mutual)*

Stephen Soscia, sole member of Mutual Properties Tollgate 275, LLC, attended the mediation and testified before this Court. (Tr. 42-72). He understood that the the parties reached an agreement wherein the money in escrow would be divided (with each party compromising its claims) and each party would then "have a piece of the funds to basically satisfy the uncompleted work that [it] feel[s] is going to benefit [its] interest in the development." (Tr. 46-47). He stated there was no agreement that Mutual would complete the remaining work required by the City of

---

3. Counsel made representations similar to those offered by their respective clients.

Warwick (Tr. 46) and that Mutual's portion of the compromised disbursements of escrow money was to settle disputed claims, not to perform future work (Tr. 44-48). Mutual's claims were based on assertions that that Douglas had performed certain work incorrectly, had not completed work required by the contract, had not completed work on time, and had not provided sufficient credits for work the parties agreed would not be performed. (Tr. 44-48). Soscia testified that each time a request was submitted for money from the escrow account, "engineers would also go out and inspect the work." (Tr. 43). Mutual stopped authorizing disbursements because its "engineer said [']we can't release more money than the value to complete the project[']." (Tr. 51). He identified Mutual's claims that Douglas had: 1) incorrectly installed an electrical vault/box (Tr. 44); 2) not installed water services (Tr. 44); 3) failed to properly credit SHI and Mutual for irrigation work that was agreed not to be installed (Tr. 47); 4) failed to construct stone walls for an entrance sign Mutual believed were required (Tr. 48); and 5) contractual penalties (Tr. 47). *See also* Tr. 61 ("items that are either not completed for which sufficient credits were not issued, items that were completed and needed to be corrected, or items that were not completed"). Soscia described his perception of the stone walls issue:

> And the biggest dispute was are the stone walls part of the sign allowance. The stone walls are the stone walls. There are two stone walls. There are two signs that will eventually get built on top of those stone walls. The one to benefit SHI's project and one to benefit our project. We agreed to share the cost of the sign, which is that $15,000 allowance, but we're missing two stone walls to support those signs. * * * It is clear that the stone walls are in the Douglas contract, they are on the plans as part of the improvements that were approved by The City and are part of the construction documents.

(Tr. 51-52).

Soscia testified that any remaining work required by the City of Warwick was "going to be done by SHI." (Tr. 48); *see also* Tr. 71 ("If [SHI] ha[s] obligations with the City of Warwick to complete the work, that's between [SHI] and the City of Warwick."). He believed the parties would

exchange mutual releases up to the date of the mediation. (Tr. 48, 68). He understood that going forward, after the agreement, SHI and Mutual still had an easement agreement and would need to cooperate to build a sign. (Tr. 48-49). He understood provision three of the mediator's emailed terms to mean: "If we're going to build a sign that is going to benefit both parties, we need to cooperate with one another and get it built and share the cost of that sign as outlined in the easement agreement." (Tr. 52).

He understood provision two to mean that Mutual was free to use its portion of the freed escrow money "to make improvements that would solely benefit Mutual within the development", such as fixing the electrical vault/box, water services, or the stone walls for the sign. (Tr. 54-55). Soscia further understood that SHI's portion of the freed escrow money was "to complete any work that they choose to do, or that they're obligated to do" under other agreements, such as with the City of Warwick. (Tr. 56); *see also* Tr. 70 ("The essence of the settlement was[:] you guys each need to agree on a sum of money that you're going to be unhappy with and each go your separate ways. There was no specificity in the mediator's settlement agreement as to what [Mutual] was to use [its] money for, what [SHI was] to use [its] money for, or what Douglas was to use their money for."); Tr. 71 ("If [SHI] ha[s] obligations with the City of Warwick to complete the work, that's between [SHI] and the City of Warwick. If [Mutual] ha[s] obligations to install water service for someone that [Mutual] may have one of those other lots sold to, then that's [Mutual's] obligation to complete. So it was not specific with regard to what anyone was going to do with their share of our funds that are in escrow."). Neither SHI nor Mutual owed each other any further performance other than to cooperate reasonably with the signage work. (Tr. 57).

*Testimony of Andrew Rahrig (Douglas)*

Andrew Rahrig, Vice President of Construction the Douglas Company, also attended the mediation and testified at the hearing; he was Douglas's project manager for the access road. (Tr. 74-84). He testified that Douglas was owed approximately $91,000 for work completed. (Tr. 81). He understood that, as a result of the mediation, Douglas was to receive $65,000 and to provide previously-purchased materials for water service; it would have no further obligations. (Tr. 76-77, 80, 83). Rahrig testified that a monument sign (with a $15,000 allowance) was part of its contractual obligation, but that this money was credited back to SHI/Mutual. (Tr. 77-78). He stated that there was no standalone stone wall in the plans and that the base of a foundation for a sign "would have been included as part of the monument sign allowance" (Tr. 77), and that the stone "would have been the base that the sign sits on for the monument sign allowance" (Tr. 78). He also testified as to the engineer's report from Mutual, asserting Douglas had responded to each item therein, either crediting back or completing the work (except for the irrigation "which was part of our settlement where we went from the 91,000 to the 65,000"). (Tr. 78-79). Rahrig's understanding at the mediation "was Mutual was going to complete the balance of the work with everybody getting back their share of the money" and that SHI had not agreed to any further work. (Tr. 80).

Rahrig did not authorize Douglas's agreement to the bullet points in the mediator's email, but understood that David Backbrader, Executive Vice President of Douglas approved the agreement. (Tr. 83).

*Testimony of John Oguzturk (SHI)*

John Oguzturk, Vice President of Construction of Kaplan Development Group, also attended the mediation on behalf of SHI[4] and testified before the Court. (Tr. 86-114). According to his accounting department's reconciliation of costs, SHI was owed $45,229.33 and Douglas was owed $91,111 from the escrow account. (Tr. 93); *see also* SHI Ex. 7. Oguzturk testified that the monument sign and landscaping (part of the bond requirement for the City of Warwick) were the stumbling blocks to completion of the project. (Tr. 94). He testified regarding a price quotations sent to Mutual for a sign and a price quotation for installation of stone walls to hold a sign. (Tr. 95); *see also* SHI Ex. 8 ($15,738.25 quote for monument sign); SHI Ex. 9 ($32,800 (per wall) quote for installation of stone wall for sign). He stated that installation of the stone wall was not part of the original specifications on which Douglas provided a bid and he did not believe that $65,000 should be used to support a monument sign. (Tr. 95-96). He testified that in other facilities, signs were installed on a foundation, without stone walls. (Tr. 96). As of December 2017, the City of Warwick retained a bond of $17,560 from SHI; $7,560 of this was for granite bounds on the road and $10,000 was for landscaping. (Tr. 96-97); *see also* SHI Ex. 10. Oguzturk testified that the landscaping was in good condition and that the only work remaining at the time of the mediation was the monument sign and the granite bounds (and possibly final landscaping), which he estimated would cost $32,000 to $33,000 to complete. (Tr. 97, 100). He testified that at the mediation, the parties discussed  Mutual would complete this work and that was one of the reasons why SHI was willing to allow Mutual to retain some of the escrow funds. (Tr. 98). He believed provision two in the mediator's email meant "Mutual Properties would finish up the work for the

---

4. Oguzturk testified that Kaplan is the parent company of Senior Development Housing, LLC and that agency had authority to act on behalf of SHI at the mediation. (Tr. 101).

amount of money that was taken from the escrow account" (Tr. 99); this work included finishing the monument sign, installing the granite bounds, and resolving "any landscape issues" (Tr. 100). SHI believed there was no obligation to put up stone walls for the monument sign, but Oguzturk acknowledged that Mutual believed the opposite. (Tr. 104). Oguzturk testified that paragraph two in the settlement agreement draft by Koenig reflected his understanding of the agreement reached at the mediation. (Tr. 100). He stated SHI would not have settled this case without an understanding and direction that Mutual would complete the work. *Id.* Oguzturk believed the settlement was reached at the mediation session. (Tr. 106) ("When we left the mediation, we were under the impression that we agreed to $65,000 to Douglas, $32,000 to SHI, and remaining goes to [Mutual] and [Mutual] could finish up the remaining work."); *see also* Tr. 107, 109. As to Mutual's claims regarding the issues identified by the engineer's report (or the "punch list"), Oguzturk testified that Douglas addressed each item by completing the work or providing credits. (Tr. 111). When asked whether there are a dispute over installation of an electrical vault, Oguzturk testified that it was "hard to say because the work has been done and completed and this was an after fact, so I can't really talk about that, I don't know." (Tr. 103).

## DISCUSSION

Currently pending before the Court is Douglas's Motion to Enforce Settlement Agreement. (Doc. 37). Therein, Douglas asserts the parties had a settlement agreement (at least as to claims related to Douglas), citing the above post-mediation emails between counsel and the mediator. It contends that Douglas agreed to compromise the amount owed to it, in exchange for an end to the litigation it began and no further performance obligations. Mutual responds that there was no agreement as Mutual did not agree to the written settlement agreement as drafted by SHI, and there was ultimately no "meeting of the minds" between Mutual and SHI as to the completion of the

project. (Doc. 39). SHI, in a Prehearing Memorandum, asserts that the Motion should be granted as to the claims between Douglas and Mutual, but denied as to the claims between Mutual and SHI. (Doc. 47). This so, SHI asserts, because SHI and Mutual did not agree regarding completion of the project. For the reasons discussed below, the undersigned finds there is an enforceable settlement agreement between the parties, and GRANTS Douglas's Motion to Enforce (Doc. 37).

A district court has "inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case." *Kukla v. Nat'l Distillers Prod. Co.*, 483 F.2d 619, 621 (6th Cir. 1973) (internal quotation and citation omitted).[5] This power "has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation." *Id.* "To effectuate this policy, the power of a trial court to enforce a settlement agreement has been upheld even where the agreement has not been arrived at in the presence of the court nor reduced to writing." *Id.*; *see also Henley v. Cuyahoga County Bd. of Mental Retardation & Developmental Disabilities*, 141 F. App'x 437, 441-42 (6th Cir. 2005) ("The existence of a valid settlement agreement 'is not diminished by the fact that the parties have yet to memorialize the agreement.'") (quoting *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001)); *see also RE/MAX Int'l*, 271 F.3d at 646 ("When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement."). "Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *RE/MAX Int'l*, 271 F.3d at 645-46

---

5. This Court has jurisdiction to enforce a settlement agreement, despite Mutual's pending arguments (*see* Doc. 38) regarding the Court's original jurisdiction. *See Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976) ("Even in those instances in which the court's original jurisdiction may have been questionable, it has jurisdiction over settlement agreements, the execution of which renders the prior controversy academic."); *see also* Tr. 17 (statement by Mutual's counsel that he "underst[ood] the case law indicating even if there's a defect in original jurisdiction, that the Court would still have jurisdiction to enforce settlement agreements[.]").

13

(citing *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988)). Ordinarily, an evidentiary hearing is required where facts material to an agreement are disputed. *Kukla*, 483 F.2d at 622.

Choice of Law

Before diving into the settlement waters, the Court must determine the applicable law. Each party has, at some point, cited Ohio law regarding the determination of whether there is a settlement agreement. *See* Doc. 37 (Douglas's Motion to Enforce); Doc. 39 (Mutual's Opposition); Doc. 47 (SHI's Prehearing Memorandum). But Douglas (Doc. 37, at 9) and Mutual (Tr. 21) have also raised the possibility that Rhode Island contract law applies. Therefore, the undersigned first undertakes a brief choice of law analysis before proceeding to the underlying issues.[6]

"Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law." *Smith v. ABN AMRO Mortg. Group, Inc.*, 434 F. App'x 454, 460 (6th Cir. 2011) (citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150 (6th Cir. 1992)). Furthermore, if the district court's jurisdiction is premised on diversity of citizenship, as it is here, the choice of law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941); *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). Where the "primary question" is whether the parties entered into a settlement agreement at all, the district court must apply the choice-of-law rules of the forum state. *Bamerilease*, 958 F.2d at 152 (citing *Lee v. Hunt*, 631 F.2d 1171, 1173–74 (5th Cir. 1980)).

Thus, the Court first applies Ohio choice of law rules to determine which state's substantive law applies. Ohio applies the "factor-driven 'significant relationship' approach set forth at Sections

---

6. No party has made an argument that this choice of law issue is in any way case-dispositive. The principles involved are basic contract formation and interpretation issues.

187 and 188 of the Restatement of Conflicts" to resolve choice-of-law issues that arise in actions based in contract. *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 220 (Ohio 2001); *see also Power-Tek Sols. Servs., LLC v. Techlink, Inc.*, 403 F.3d 353, 357-58 (6th Cir. 2005) (citing *Ohayon* and upholding application of Section 188 to choice-of-law question in breach of contract case). Relevant here is Section 188 of the Restatement, which addresses the "Law Governing In Absence Of Effective Choice By The Parties." Restatement (Second) of Conflict of Laws § 188. First, Section 188 states that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties" to the contract. *Id.* Second, Section 188 lists the factors a court should consider to determine the state with most significant relationship: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2). Each of the foregoing factors should "be evaluated according to their relative importance with respect to the particular issue." *Id.* § 188(2)(e).

In this case, the undersigned finds no question that these factors clearly favor the application of Rhode Island contract law to the purported settlement agreement. The mediation was conducted in Rhode Island (factor (b)), the place of performance of the underlying disputed contract is Rhode Island (factor (c)), and the subject matter of the settlement is in Rhode Island (factor (d)). As such, the undersigned will apply Rhode Island law to determine whether the parties reached an enforceable settlement agreement.

Motion to Enforce

The parties dispute whether a settlement agreement was reached, and, if so, what the terms of that agreement were.

"The intent of the parties when entering a settlement agreement is an issue of fact to be decided by the district court." *Brown v. Cty. of Genesee*, 872 F.2d 169, 174 (6th Cir. 1989) (citing *Jennings v. Metro. Gov't of Nashville*, 715 F.2d 1111, 1114 (6th Cir. 1983)). Rhode Island courts "treat[] settlement agreements as [they] do any other type of contract, applying . . . general rules of contract construction." *Furtado v. Goncalves*, 63 A.3d 533, 537 (R.I. 2013). "For parties to form an enforceable contract, there must be an offer and an acceptance." *Opella v. Opella*, 896 A.2d 714, 720 (R.I. 2006). "Each party must have and manifest an *objective* intent to be bound by the agreement." *Id.* (citing *Weaver v. Am. Power Conversion Corp.*, 863 A.2d 193, 198 (R.I. 2004)) (emphasis added). "[A] litigant must prove mutual assent or a 'meeting of the minds between the parties.'" *Mills v. R.I. Hosp.*, 828 A.2d 526, 528 (R.I. 2003) (quoting *J. Koury Steel Erectors, Inc. of Mass. v. San–Vel Concrete Corp.*, 387 A.2d 694, 697 (1978)). In determining the parties' intent, the court looks "not to some undisclosed intent that may have existed in the minds of the contracting parties[,] but . . . instead the intent that is expressed in the language of the contract." *Westinghouse Broad. Co. v. Dial Media, Inc.*, 410 A.2d 986, 991 n.10 (1980). "Without such objective manifestations of mutual assent, courts will often find that a contract was not, in fact, formed." *Acinapura v. Natalizia*, 2003 WL 22048717, at *3 (R.I. Super. Ct.). Further, Rhode Island courts explain that an implied-in-fact contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document." *Marshall Contractors, Inc. v. Brown Univ.*, 692 A.2d 665, 669 (R.I. 1997). "The difference between an

express contract and an implied-in-fact contract is simply the manner by which the parties express their mutual assent." *Id.* To be enforceable, an implied-in-fact contract "must contain all [of] the elements of an express contract"; that is, the "essential elements of contracts 'implied in fact' are mutual agreement, and intent to promise, but the agreement and the promise have not been made in words and are implied from the facts." *Bailey v. West*, 249 A.2d 414, 416 (1969). "In determining whether these elements are present, [courts] generally look to the 'parties' conduct, actions, and correspondence.'" *Cote v. Aiello*, 148 A.3d 537, 545 (R.I. 2016) (quoting *Marshall Contractors, Inc.*, 692 A.2d at 416). Similarly, the existence of a valid agreement is not diminished by the fact that the parties have yet to reduce its final terms to writing. When parties have agreed on essential terms, and all that remains is to memorialize the agreement, the parties are bound by the agreement. *See RE/MAX Int'l*, 271 F.3d at 646.

### There is a Settlement Agreement

The undersigned finds, based on all the evidence, that that parties objectively manifested mutual assent to the terms set forth in the mediator's May 23, 2019 email and there is an enforceable settlement agreement here. *See Weaver*, 863 A.2d at 198. Douglas does not dispute that it agreed to these terms. Mutual demonstrated its assent by way of Crane's May 30, 2019 email. (Doc. 37-1, at 2) (stating the mediator's terms were "agreeable to Mutual subject to the language in the mutual release"). And SHI demonstrated its assent by: 1) not voicing any objection to the mediator's email (purporting to set forth SHI's own settlement position and stating a settlement had been reached on those terms), and shortly thereafter 2) proceeding to draft a settlement agreement in response to that email. *See* Mutual Ex. C, Doc. 48-3. Further illustrating that the parties had reached an agreement, the parties (by way of Mutual's counsel) filed a joint status report on June 13, 2019 stating that: "The parties have reached a tentative agreement and

are negotiating the terms of a written settlement agreement." (Doc. 36). Although the use of the word tentative "may communicate some degree of equivocation, it provides little support for [the] claim that settlement was somehow contingent on the negotiation of additional material terms." *Bosley v. 21 WFMJ Television, Inc.*, 245 F. App'x 445, 451 (6th Cir. 2007). In *Bosley*, the Sixth Circuit upheld a district court's finding that parties had settled when they notified the court that they had "effectively reached a settlement". *Id.* It explained: "The notice did not say that the parties were *close* to settlement or that talks were *on the verge* of producing an agreement. Rather, the defendants themselves stated an agreement had effectively been reached and that the process of drafting documents had begun." *Id.* (emphasis in original). The same is true here.

Mutual asserts there was no meeting of the minds, pointing to the subsequent emailed disagreement over whether the settlement obligated Mutual to complete specific work; that is, the disagreement over item number two in the mediator's email versus item number two in SHI's initial draft agreement. SHI agrees, but to a lesser degree, arguing only there was no meeting of the minds between SHI and Mutual (but asserting that the agreement as to Douglas should be enforced). However, as described above, the objective acts of the parties do not support that this drafting disagreement demonstrates a lack of mutual agreement to settle. *See Re/Max*, 271 F.3d at 646 (noting that even though parties had not yet formalized their agreement in writing, their "objective acts . . . reflect[ed] that an agreement had been reached"); *see also Bosley*, 245 F. App'x at 450-51 ("Defendants seem to assume that because they would have preferred that the agreement contain terms different from those agreed upon by Bolton and Kabat, the agreement must necessarily be incomplete, and as a consequence, there was no meeting of the minds. Just as the district court observed, however, the objective acts of the parties do not support defendants' position."); *see also Cote*, 148 A.3d at 545 (in determining whether a contract has been formed,

courts look to "the parties' conduct, actions, and correspondence") (internal citation and quotation omitted); *Furtado*, 63 A.3d at 537 ("Each party must have and manifest an *objective* intent to be bound by the agreement.") (emphasis added).

*Terms of the Agreement*

Having found the parties entered into a settlement agreement pursuant to the agreed-to terms in the mediator's email, the next question for the Court is the content of that agreement.

Again, the Court turns to Rhode Island contract law. *See Furtado*, 63 A.2d at 537 ("We have previously treated settlement agreements as we do any other type of contract, applying our general rules of contract construction."). "[T]he existence of ambiguity *vel non* in a contract is an issue of law to be determined by the [C]ourt." *Derderian v. Essex Ins. Co.*, 44 A.3d 122, 127 (R.I. 2012) (internal quotation omitted) (alteration in original). In assessing whether contract language is ambiguous, courts "'give words their plain, ordinary, and usual meaning.' . . . The subjective intent of the parties may not properly be considered by the court; rather, [the court] 'conside[s]r the intent expressed by the language of the contract.'" *Id.* at 128 (quoting *Bliss Mine Road Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.*, 11 A.3d 1078, 1083-84 (R.I. 2010). Thus, when a contract is clear and unambiguous by its terms, "what is claimed to have been the subjective *intent* of the parties is of no moment." *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 560 (R.I. 2009) (emphasis in original); *see also Westinghouse Broad. Co.*, 410 A.2d at 991 n.10 ("[T]he intent we seek is not some undisclosed intent that may have existed in the minds of the contracting parties but is instead the intent that is expressed in the language of the contract."). Finally, "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.*, 852 A.2d 535, 542

(R.I. 2004) (quoting *Clark–Fitzpatrick, Inc./Franki Found. Co. v. Gill*, 652 A.2d 440, 443 (R.I. 1994)).

The undersigned here repeats the terms set forth by the mediator's email:

1. Payment out of the escrow of the following amounts (and then closure of the escrow)

    a. $32,000 to SHI

    b. $65,000 to Douglas

    c. $33,773 to Mutual

2. Mutual takes responsibility for cost and management of any work Mutual decides to do.

3. SHI and Mutual must commit to reasonable cooperation on the signage work.

4. Mutual/reciprocal releases for any actions/issues up to the date of the release.

(SHI Ex. 11); (Mutual Ex. A, Doc. 48-1).

Although various individuals testified as to their subjective beliefs regarding the meaning of the settlement agreement, as noted above, the Court looks not to "some undisclosed intent that may have existed in the minds of the contracting parties" but rather, to "the intent that is expressed in the language of the contract." *Westinghouse Broad. Co.*, 410 A.2d at 991 n.10. Looking to the language of the agreement, as expressed in the mediator's email, the Court finds its terms unambiguous.

First, no one disputes the first term – that each party was to receive payment out of the escrow account, and then that account would close. This is unambiguous.

Second, all party representatives testified that a settlement agreement was reached, either at the mediation or through the parties' emails shortly thereafter. *See* Tr. 46-47, 63-64 (Soscia); Tr. 82-83 (Rahrig); Tr. 105-07 (Oguzturk). And, despite the parties' vehement disagreement over

their subjective intentions in entering into this agreement (summarized above), the Court finds language of provision two in the mediator's email also unambiguous – "Mutual takes responsibility for cost and management of any work *Mutual decides to do*." (Mutual Ex. A., Doc. 48-1) (emphasis added). Giving these words their "plain, ordinary, and usual meaning", *Bliss Mine Road Condo. Ass'n*, 11 A.3d at 1083, this language gives Mutual complete agency and sole authority to determine what that work may be. The undersigned finds it would impossibly strain this language to say (as SHI and Douglas advocate, and Oguzturk and Rahrig testified) that Mutual was required to complete certain specific tasks related to the construction project with the money it received from escrow. Moreover, it defies plain language interpretation to imply from the first provision (a listing of dollar amounts to be paid from the escrow account to three different parties) that one of those three parties (Mutual) had specific obligations, but the other two did not. The undersigned further notes that (similarly) nothing in this language implies that SHI had any obligation *to Mutual* to perform any specific work.[7] Moreover, this language makes sense in terms of the parties' agreements and dealings. By stating that Mutual would take responsibility for any work it decided to do, it expressly excluded any responsibility on SHI's part to contribute to any of said work.

Other language in the mediator's email further supports this conclusion. Although SHI contends it would not have agreed to settle if the agreement allowed the project to remain incomplete, the language of the mediator's third point: "SHI and Mutual must commit to reasonable cooperation on the signage work" expressly contemplates just that. Indeed, the

---

7. This is not to say that SHI or Mutual had no obligations to others. Those obligations are not changed by the terms of the settlement agreement reached. For example, though not described in the settlement agreement, SHI, though the surety bond, had an obligation to the City of Warwick. *See* SHI Ex. 10. And Soscia testified that Mutual may have had obligations to future tenants for water services. *See* Tr. 71. But the settlement agreement itself, by its terms, does not obligate SHI or Mutual to do anything other than reasonably cooperate on the sign.

"reasonable cooperation" signage provision in the mediator's email is the only specific performance obligation set forth therein. The sign was incomplete and the testimony summarized above makes clear that SHI and Mutual had differing ideas regarding what was required to complete it. This leaves open that SHI and Mutual would have to work together to resolve their disputes regarding the sign going forward.

Finally the language in the fourth provision also supports the conclusion that the parties agreed to settle their pending disputes, but not end their relationship. It provides for "Mutual/reciprocal releases for any actions/issues *up to the date of the release*." Again, this language, read plainly, contemplated a release up to a certain point, not going forward. The basis for the underlying suit at issue was that Douglas had not been paid. SHI asserted that Mutual, rather than SHI, was at fault for this. Mutual disputed this. As a result of the settlement agreement put in motion at the mediation and completed by the parties' subsequent correspondence, the parties agreed to resolve these pending issues. Douglas has now been paid and owes no further performance. Mutual and SHI no longer have claims against each other on the bases described herein.

This settlement agreement did what most such agreements do. It provided each party with something less than it thought itself entitled to. Douglas believed it was entitled to about $91,000, but agreed to settle for $65,000. SHI believed it was entitled to about $45,000 (and for Mutual to complete the project) and walked away with $32,000. Mutual believed it was entitled to certain contractual penalties, having allegedly incorrectly-completed work fixed, and (perhaps most significantly), having Douglas install stone walls installed for the monument sign from escrowed monies. It agreed to take $33,773 to settle these claims. The undersigned expresses no opinion regarding which party was correct about any of these disputed elements. But it is of no matter

because that is the very nature of settlement. A party takes less than it believes it is entitled to in exchange for an end to the dispute. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) ("[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."). The undersigned finds that the parties reached a settlement in this case, and the terms of that settlement are as described above.

Attorney's Fees and Prejudgment Interest

Douglas also moves for attorney's fees and prejudgment interest from Mutual based on its assertion that Mutual breached the settlement agreement, citing Ohio law.[8] It argues Mutual breached the agreement "by refusing to agree to the form of the final release" and "by now actively trying to renege on the entire agreement." (Doc. 37, at 13). The parties stipulated at the hearing that Douglas had incurred $10,848.50 in attorney's fees between July 2019 and January 2020. (Tr. 73-74). Although the Court has now determined that the parties reached a settlement, the Court also finds, however, that there was a genuine dispute between the parties about whether a settlement had been reached, not a "breach" of that agreement as Douglas characterizes it. Further, the parties undertook good-faith efforts to resolve the dispute in the interim. As such, the Court declines to award attorney's fees or prejudgment interest.

_____

8. Under Rhode Island law, a court "*may* award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court . . . finds that there was a complete absence of a justiciable issue of either law or fact by the losing party." R.I. Gen. Laws § 9-1-45 (emphasis added). Under Ohio law (as Douglas cites), attorney fees are permitted as compensatory damages for breach of a settlement agreement. *See, e.g., Rayco Mfg., Inc. v. Murphy, Rogers, Sloss & Gambel,* -- N.E.3d --, 2019 WL 4509394, at *4 (Ohio Ct. App.) (collecting cases).

<u>Mutual's Motion to Dismiss, Transfer, or Stay (Doc. 38)</u>

Having found above that a valid settlement agreement exists between the parties that this Court can enforce, the undersigned DENIES as MOOT Mutual's pending Motion to Dismiss, Transfer, or Stay. (Doc. 38).

CONCLUSION

Therefore, as set forth herein, Douglas's Motion to Enforce Settlement Agreement (Doc. 37) is GRANTED as to the request to enforce, and DENIED as to the request for attorney's fees and prejudgment interest. The Court retains jurisdiction to enforce the terms of the settlement.

 s/ James R. Knepp II
United States Magistrate Judge